1

2

3

4

5

6

7

8                        IN THE UNITED STATES DISTRICT COURT

9                        FOR THE EASTERN DISTRICT OF CALIFORNIA

10   ANDREW WRIGHT GILL,

11                  Petitioner,                    2:  09 - cv - 748 JAM TJB

12         vs.

13   MICHAEL MARTEL,

14                  Respondents.           ORDER, FINDINGS AND

15                                         RECOMMENDATIONS

16   _____/

17         Petitioner, Andrew Wright Gill, is proceeding *pro se* with a petition for writ of habeas

18   corpus pursuant to 28 U.S.C. § 2254.  Petitioner is currently serving a sentence of sixty-four

19   years and eight months to life imprisonment after being convicted by a jury of numerous crimes

20   including:  (1) kidnapping to commit spousal rape, rape by a foreign object and forcible oral

21   copulation; (2) spousal rape; (3) rape by a foreign object; (4) forcible oral copulation; (5) making

22   criminal threats; (6) attempted rape by a foreign object; (7) infliction of corporal injury on a

23   spouse; (8) cutting a utility line; and (9) residential burglary.  Petitioner raises four claims in his

24   amended federal habeas petition; specifically:  (1) the trial court erred when it denied Petitioner's

25   motion to disqualify the district attorney ("Claim I"); prosecutorial misconduct ("Claim II"); (3)

26   the trial court erred in allowing Petitioner's statement to police to be admitted into evidence

1

1  ("Claim III"); and (4) Petitioner's preliminary examination was held in violation of California

2  Penal Code § 859(b) which violated Petitioner's Constitutional rights ("Claim IV").  For the

3  following reasons, Petitioner's amended federal habeas petition should be denied.

4                              II.  FACTUAL BACKGROUND[1]

5       Mark Gantt had lived next door to the Gills for several years and
        saw them every day or so.  On the morning of January 31, 2004, he
6       met defendant for breakfast at Denny's restaurant around 9:00 a.m.
        Defendant was "very agitated" and told Gantt that T.G.
7       [Petitioners' wife] would not let him back in the house.  Gantt tried
        to calm defendant and advised him to stay away from the house to
8       avoid causing more problems.

9       Gantt met defendant later that morning at the Home Depot at
        T.G.'s request.  T.G. had given Gantt a suitcase, $50 and a note to
10      deliver to defendant.  The gist of the note was "get a job, be
        accountable, and talk to me."  Gantt collected a set of house keys
11      from defendant and returned them to T.G.

12      Between noon and 1:00 p.m, Gantt observed that defendant had
        parked his car in front of the house.  Gantt spoke with T.G. on the
13      phone.  She told him that she was afraid of what defendant might
        do.  Gantt went outside and spoke with defendant for 15 or 20
14      minutes.  According to Gantt, defendant was very upset.  Gantt
        spoke with defendant a second time an hour later, describing
15      defendant as "very, very upset."

16      At that point, Gantt advised T.G. to call the police and called the
        police himself.  The police officers arrived around 4:00 p.m. and
17      spoke with both defendant and T.G.  T.G. asked for an emergency
        protective order, but the request was denied.  The officers
18      suggested to defendant and T.G. that one of them leave in order to
        avoid any further problems.  Defendant responded that it was
19      unfair for him to leave.  He told the officers that he intended to
        wait in his car until T.G. allowed him back into the house.

20
        Defendant telephoned his house around dinnertime in an attempt to
21      resolve things with T.G., but she did not answer.   Defendant left a
        message indicating that, "there was going to be trouble" if T.G. did
22      not speak to him.

23      Gantt met with defendant in front of the house for a third time later
        that evening.  He urged defendant to leave, but gave him a blanket
24

25          [1] The factual background is taken from the California Court of Appeal, Third Appellate
26  District opinion on direct appeal dated January 22, 2008 and filed in this court on June 8, 2010
    by Respondent as Lodged Document 4 (hereinafter "Slip Op.").

                                            2

1   in case he decided to stay.  Defendant indicated that he planned to
2   stay at a friend's house.  Gantt checked around 11:00 p.m. and
    defendant's car was gone.

3   <u>The Assault and Kidnap of T.G.:</u>

4   Just after 1:00 a.m., T.G. heard a loud bang on the front door.  [FN
    2]  She ran to the room of her 10-year-old son D.G., to look out the
5   front of the house.  T.G. ran back to her bedroom and heard
    another loud crash that sounded like glass breaking.  She tried to
6   telephone Gantt but the line was dead.
    [FN 2]  T.G's account of the events is taken from her trial
7   testimony, her interview with police detectives on February 1,
    2004, and her interview with the deputy district attorneys on
8   February 10, 2004.

9   A few seconds later, defendant walked into the bedroom, turned on
    the lights, and said, "[S]urprise."  T.G. testified that defendant was
10  "really angry," cursing and calling her a "f—ing bitch."
    Defendant grabbed T.G. by the hair and slapped her across the
11  mouth.  He hit her again when she tried to get a Kleenex to wipe
    her bloody lip.  Defendant pulled T.G. around the room by her hair
12  and kicked her in the side when she fell to the ground.  He dragged
    T.G. to a futon couch near the window and told her that she had
13  "made the biggest mistake of [her] life," and was going to "pay
    tonight," and was going to "die tonight."
14
    T.G. testified that it was like defendant had "snapped" and it was
15  not the first time it had happened.  She could recall three incidents
    where he yelled and hit her.
16
    Defendant dragged T.G. from the bedroom to the garage.  Once
17  there, defendant forced T.G. to lie face down on the floor and take
    off all of her clothes.  He put a rag in T.G.'s mouth and taped it in
18  place by wrapping duct tape around her head.  Defendant
    threatened to cut off T.G.'s right arm with a chainsaw.
19
    Defendant proceeded to sexually abuse T.G. in the garage.  First,
20  defendant put his fist up her vagina.  He then inserted a flashlight
    in T.G.'s vagina and tried to insert it in her anus.  Next, defendant
21  raped T.G. by inserting his penis in her vagina, but he stopped
    before ejaculating.
22
    Defendant took T.G. back into the house and continued to threaten
23  T.G., stating, "you're going to pay for what you did to me," and
    "You're dying tonight."  Defendant asked T.G. if she wanted to say
24  goodbye to anyone.

25  Defendant put T.G. in the backseat of the family car, face down,
    completely naked.  He bound her feet together at the ankles and
26  tied her feet to her wrists with rope.  Defendant drove toward

                                    3

1    Sacramento.

2    Eventually, defendant reached back and removed the duct tape
     from T.G.'s head and the gag from her mouth, tearing out pieces of
3    hair in the process.  As they got closer to a snowy area, defendant
     pulled off the road and got in the back seat with T.G.  He forced
4    her to orally copulate him.  He ejaculated in T.G.'s mouth and told
     her to swallow it.  T.G. cooperated because she was "scared to
5    death for [her] life."  At that point, defendant allowed T.G. to get
     dressed and join him in the front seat of the car.  However, he tied
6    her hands and feet together to prevent her from doing "something
     stupid up front."
7
     Now that T.G. was sitting upright in the seat, she saw that they
8    were close to Lake Tahoe.  It was after 5:00 a.m.  As they drove
     toward Emerald Bay, defendant said, "I'm obviously going to have
9    to end my life today."  He told T.G. that she would have to give
     something up, like a finger or a hand, so that she would "always
10   remember what [she had done] to [defendant]."  When they
     reached an area called Sugar Pine Camp, defendant parked the car
11   and unsuccessfully tried to kill himself with a hunting bow.

12   Around daylight, defendant drove out of the campground to a small
     market.  He left T.G. in the car while he brought a pack of
13   disposable razors and a banana and bottle of water for T.G.
     Defendant told T.G. that he was going to take her home, but
14   changed his mind and drove back to the campground.  He said, "I
     can't go home, I'll go to jail . . . there's a warrant for me, I can't
15   wait for that."

16   Defendant and T.G. sat in the campground while defendant tried to
     kill himself with a disposable razor.  He also placed a plastic bag
17   over his head.  These attempts at suicide also failed.  According to
     T.G., defendant appeared to realize that he did not want to kill
18   himself.  He started toward home again and T.G. encouraged him.
     As they were driving, defendant cried and apologized to T.G. for
19   causing her so much pain over the years.

20   Defendant Turns Himself In:

21   Back in Stockton, D.G, one of defendant's and T.G's sons,
     knocked at Gantt's door between 7:30 and 8:00 a.m.  He told Gantt
22   that his mother was gone.  Gantt and his adult son hurried to the
     Gill residence.  Finding parts of the house in disarray, signs of
23   forced entry, the family car missing, the outside telephone jack
     removed, and defendant's car parked around the corner, Gantt and
24   his son called the police.

25   Detective Robert Molthen questioned the children, D.G. and C.G.,
     about what had happened the night before.  D.G. told Molthen that
26   he had heard a commotion or arguing in the middle of the night.

                                    4

During the interview with D.G., Molten [sic] also learned about a prior incident of abuse.  D.G. told the detective that when he was five, he had seen defendant push T.G. onto a couch and throw things at her.

Defendant phoned home while Detective Molthen was at the Gill residence.  Molthen told defendant to go to the nearest police station.  Defendant allowed Molthen to speak with T.G.  Molthen asked T.G. if she was okay and she responded, "I don't think so."  Molthen then asked T.G. if she was being held against her will, and she said, "[N]o."

A few minutes later, defendant arrived at the police station in Jackson.  Defendant was still talking with Detective Molthen on the cell phone when he told Jackson Police Officer Curt Campbell that the Stockton police were looking for him.  Molthen talked with Campbell on defendant's cell phone and told Campbell to detain defendant and T.G.  Molthen, his partner Detective Eduardo Rodriguez, and two other officers headed for Jackson.

Meanwhile, Officer Campbell instructed defendant to sit on a bench outside the police station.  Campbell noticed fresh and dried blood on defendant's neck.  When he asked defendant how the injury occurred, defendant did not respond.  Campbell also spoke with T.G., who was sitting in the front passenger seat of the car.  T.G. told Campbell that defendant cut his neck with the blade from a Bic razor.  Campbell also noticed that T.G. had a bloody lip.  T.G. told him that defendant had hit her.  Campbell retrieved a plastic bag from the car that contained the razor blade and duct tape with brown hair attached to it.

Paramedics arrived and began to treat defendant's and T.G.'s injuries.  T.G. stated to the paramedics or Campbell that defendant had raped her.

After the Stockton police officers arrived in Jackson, Campbell gave the plastic bag to Detective Mark Reynolds.  The bag contained a 12-foot length of rope in addition to the razor blade and duct tape.  Reynolds and another officer transported defendant back to Stockton in their car.  They did not question defendant during that trip.

T.G.'s Pretrial Statements:

Detective Molthen interviewed T.G. for approximately 30 minutes in the back seat of his police car before they left Jackson.  He and Detective Rodriguez continued to interview her during the drive from Jackson to the emergency room at San Joaquin County General Hospital in Stockton.

At the hospital, Rodriguez went through the Adult/Adolescent

Sexual Assault Examination questionnaire with T.G., writing down her responses.  At no time did T.G. indicate that she had consented to the sexual acts she listed on the form.  Under the section marked "assault history," T.G. indicated that she had been assaulted that day by defendant.  In the section marked "methods employed by assailants," T.G. indicated that defendant had:  (1) used a flashlight as a weapon during the sexual assault; (2) threatened to kill her; (3) punched and kicked her; (4) grabbed, held, and pinched her; (5) physically restrained her with tape; and (6) caused her injuries including a fat lip, a bruised left arm, a bruised right knee, a bruised left eye and overall body pain.  In the section of the form marked "acts described by patient," T.G. responded that defendant had penetrated her vagina with his penis, his finger and a flashlight.  She also stated that defendant had tried to penetrate her anus with the flashlight..  T.G. responded that she had orally copulated defendant and he had ejaculated in her mouth.

Later in the evening, T.G. met for five hours with Susan Sixkiller, a victim advocate with the San Joaquin County District Attorney's Office.  T.G. told Sixkiller that defendant had abducted her from the house the night before, thrown her into a car, and raped her.  T.G. never stated or implied that the acts were committed with her consent.  She also told Sixkiller that defendant had bound her with duct tape around her wrists, head and hair.  T.G. described defendant as having a glazed-over, evil look in his eyes that she had never seen before.

Ten days after the incident, T.G. spoke with Deputy District Attorney Michael Mulvihill about the case.  T.G. agreed to a taped interview although she was under no obligation to do so.  T.G. told Mulvihill that defendant had started abusing her physically in March 1993, a month after they were married.  At no time during the interview did T.G. tell Mulvihill that she had consented to any of the sexual acts that occurred on the morning of February 1, 2004.

Defendant's Pretrial Statements:

After they returned from the hospital, Detectives Molthen and Rodriguez interviewed defendant at the police station.  At the start of the interview, defendant told the detectives that they could ask him any question they wanted, but he was "not going to be very forthcoming."  He admitted that he "flipped out" when T.G. asked him to leave the house and that he "did her wrong."  However, defendant stated multiple times that it was unfair for her to kick him out of the house.  Defendant indicated that he had wanted to resolve things with T.G. that night and "couldn't handle it" when she stopped answering the telephone.

Defendant stated that he would not talk about the specifics of what happened because he did not want "to put it together" for the

police.  Defendant told Molthen and Rodriguez that he "left a really wide trail" that night and admitted that he "was one hundred percent wrong."  He continued, "[Y]ou guys got the story and anything I add to it is just going to screw me even more."  Later, defendant added, "The whole picture is there, you know it as well as I do."

The detectives continued to question defendant about specifics.  When Rodriguez suggested that defendant's silence about the details of what happened might cause people to think that he was trying to get away with his crimes, defendant responded that he would, "be happy to corroborate [T.G.'s] deposition so that the kids [would not] have to participate."  Defendant told Molthen and Rodriguez that "[T.G.] [was] an honest person . . . and uh . . . she gives it straight up."

Eventually, defendant described details of the events of the night before.  He told the detectives about:  (1) parking his car down the street from the house so that T.G. and the neighbors would not know he was there; (2) borrowing a screwdriver from a friend's house so that he could open the telephone box; (3) disconnecting the telephone and calling from a nearby pay phone to make sure the line was dead; (4) returning to the house and trying to break down the front door; (5) removing the screen and entering through a window on the side of the house; (6) screaming at T.G., saying "this is what [you] get;" (7) pushing T.G. around and hitting her in the bedroom; (8) dragging T.G. by her arm or hair into the garage; (9) tying her up; (10) forcing her to have sex and sticking the flashlight into her vagina; (11) threatening to cut off her body parts; (12) putting a gag in her mouth; (13) using the computer while T.G. lay face down on the carpet; (14) putting T.G. face down in the back seat of the car, hog-tying her, and driving away to get out of the county; and (15) having T.G. orally copulate him.  At the end of the interview, defendant stated, "I've been honest with you, straight up."  He was comfortable with the fact that he had corroborated T.G.'s description of what had happened.

<u>Defendant's Testimony:</u>

At trial defendant testified that he never forced T.G. to have sex against her will.  He explained that he and T.G. "Had an agreement that [they] would try anything."  According to defendant, they trusted each other not to hurt the other and if T.G. ever said "uh-uh" or "stop," defendant would immediately stop what he was doing.  Defendant testified that the sex acts that occurred on February 1, 2004, were "the same sexual things" that they had "always done."  He stated that he and T.G. often inserted objects into each other, took joy rides, had sex in different places, ripped clothes off each other, and had sex out in the warm sun.  Defendant testified that they engaged in acts of bondage in the garage and the rope found in the Volvo was purchased for that purpose.

Defendant acknowledged that he was angry and yelled at T.G. when he found her trying to make a phone call from their bedroom early on the morning of February 1, 2004. He cried after striking her and they exchanged "forgiveness." Defendant testified that while he and T.G. were talking, she started touching him in a sexual manner. According to defendant, they went to the garage to engage in a typical sexual game. Defendant stated that T.G. did a striptease for him, and consented to being gagged and tied up. He maintained that she consented to the subsequent sexual acts and to leaving the house with him for a "joy ride."

When questioned about his statements to police, defendant testified that he "just told [the detectives] what they wanted to hear" because he was frustrated, tired, hungry, and "just wanted it to be over." He denied coercing T.G. into testifying in a certain way.

T.G.'s Testimony:

T.G. testified for the defense, stating that defendant did not force her to go anywhere with him, did not force her to have sex against her will, and did not threaten her in anyway on February 1, 2004.

(Slip Op. at p. 3-15.)

## III. PROCEDURAL HISTORY

After a jury trial, Petitioner was convicted of the charges outlined in supra Part I. Petitioner appealed to the California Court of Appeal, Third Appellate District. Petitioner raised several claims to the California Court of Appeal, including Claim I-III that he raises in his amended federal habeas petition. The California Court of Appeal affirmed the judgment on January 22, 2008 in a written opinion. Petitioner filed a petition for review to the California Supreme Court which included Claims I-III that he raises in his amended federal habeas petition. The California Supreme Court summarily denied the petition for review on April 30, 2008.

Subsequently, Petitioner filed a state habeas petition in the Superior Court of California, County of San Joaquin in which he raised Claim IV that he raises in his amended federal habeas petition. The Superior Court denied the state habeas petition on April 27, 2009 in a written decision. Petitioner's state habeas petitions to the California Court of Appeal and the California Supreme Court which also raised Claim IV were each summarily denied.

8

1     Petitioner filed a federal habeas petition on March 18, 2009.  He subsequently filed an

2     amended federal habeas petition on December 28, 2009.  Respondent answered the amended

3     federal habeas petition on June 9, 2010.  On July 2, 2010, Petitioner filed his traverse.

4                      IV.  APPLICABLE LAW FOR FEDERAL HABEAS CORPUS

5     An application for writ of habeas corpus by a person in custody under judgment of a state

6     court can only be granted for violations of the Constitution or laws of the United States.  See 28

7     U.S.C. § 2254(a); see also Peltier v. Wright, 15 F.3d 860, 861 (9th Cir. 1993); Middleton v.

8     Cupp, 768 F.2d 1083, 1085 (9th Cir. 1985) (citing Engle v. Isaac, 456 U.S. 107, 119 (1982)).

9     Petitioner filed this petition for writ of habeas corpus after April 24, 1996, thus the Antiterrorism

10    and Effective Death Penalty Act of 1996 ("AEDPA") applies.  See Lindh v. Murphy, 521 U.S.

11    320, 326 (1997).  Under AEDPA, federal habeas corpus relief is not available for any claim

12    decided on the merits in the state court proceedings unless the state court's adjudication of the

13    claim: (1) resulted in a decision that was contrary to, or involved an unreasonable application of,

14    clearly established federal law, as determined by the Supreme Court of the United States; or (2)

15    resulted in a decision that was based on an unreasonable determination of the facts in light of the

16    evidence presented in state court.  See 28 U.S.C. 2254(d).

17    As a threshold matter, this Court must "first decide what constitutes 'clearly established

18    Federal law, as determined by the Supreme Court of the United States.'"  Lockyer v. Andrade,

19    538 U.S. 63, 71 (2003) (quoting 28 U.S.C. § 2254(d)(1)).  "'[C]learly established federal law'

20    under § 2254(d)(1) is the governing legal principle or principles set forth by the Supreme Court

21    at the time the state court renders its decision.'"  Id. at 71-72 (citations omitted).  Under the

22    unreasonable application clause, a federal habeas court making the unreasonable application

23    inquiry should ask whether the state court's application of clearly established federal law was

24    "objectively unreasonable."  See Williams v. Taylor, 529 U.S. 362, 409 (2000).  Thus, "a federal

25    court may not issue the writ simply because the court concludes in its independent judgment that

26    the relevant state court decision applied clearly established federal law erroneously or incorrectly.

9

1  Rather, that application must also be unreasonable." Id. at 411.  Although only Supreme Court

2  law is binding on the states, Ninth Circuit precedent remains relevant persuasive authority in

3  determining whether a state court decision is an objectively unreasonable application of clearly

4  established federal law.  See Clark v. Murphy, 331 F.3d 1062, 1070 (9th Cir. 2003) ("While only

5  the Supreme Court's precedents are binding . . . and only those precedents need be reasonably

6  applied, we may look for guidance to circuit precedents.").

7       The first step in applying AEDPA's standards is to "identify the state court decision that

8  is appropriate for our review."  See Barker v. Fleming, 423 F.3d 1085, 1091 (9th Cir. 2005).

9  When more than one court adjudicated Petitioner's claims, a federal habeas court analyzes the

10 last reasoned decision.  Id. (citing Ylst v. Nunnemaker, 501 U.S. 797, 803 (1991)).

11                    V.  ANALYSIS OF PETITIONER'S CLAIMS

12      A.  Claim I

13      In Claim I, Petitioner argues that the trial court violated his due process and fair trial

14 rights when it denied a defense motion to disqualify the district attorney from prosecuting this

15 case.  Petitioner argues that the district attorney's office had a personal bias towards him.  The

16 last reasoned decision on this Claim was from the California Court of Appeal on direct appeal

17 which stated the following:

18          Before trial, defendant moved to disqualify the entire San Joaquin
            County District Attorney's Office from prosecuting his case and to
19          appoint the Attorney General to assume prosecutorial duties in its
            stead.  [FN 3]  Defendant argued that two deputy district attorneys
20          – Michael Mulvihill and Kristine Reed – "ha[d] taken a personal
            interest in the case and ha[d] made a concerted effort to influence
21          the testimony of the alleged victim."  Defendant maintained that
            after T.G. informed them that she consented to the acts charged,
22          Mulvihill and Reed "responded . . . by threatening her, demeaning
            defense counsel and making other inappropriate statements."
23          Citing this conduct, defendant asserted that a conflict of interest
            existed which made it unlikely "that [he would] receive a fair
24          trial."  The court denied the motion.  On appeal, defendant
            contends that "Deputy District Attorneys Mulvihill and Reed
25          conducted a pretrial interview of [T.G] in which she was misled as
            to what was in her best interests and that of her family, resulting in
26          a conflict of interest that makes it unlikely that [defendant]

                                10

received a fair trial." There is no merit in defendant's contention.
[FN 3] Defendant acknowledged that although he sought recusal
of the entire San Joaquin County District Attorney's Office in his
motion in the trial court, his argument on appeal "focuses on the
actions of the two deputies and compels the conclusion that they
should have been recused from the case, requiring reversal.

A. T.G's Pretrial Interview At The District Attorney's Office:

Defendant's claim of conflict arises from Mulvihill's and Reed's
meeting with T.G. and her father at the district attorney's offices on
February 10, 2004. [FN 4] Mulvihill testified that he spoke with
T.G. informally before he and Reed conducted the recorded
interview that the prosecution played for the jury at trial. Mulvihill
stated at the start of the recorded interview, "[W]e talked for about
an hour with you and your dad downstairs, just about, not about the
facts or anything right? We were just talking about general . . . .
[¶] . . . [¶] [p]rocedures and what's going on in the case right now.
It's my understanding that you're up here today of your own free
will and you don't . . . you [sic] freely volunteering to talk to . . .
us. We're not forcing you to, is that right?" T.G. responded,
"That's correct."
[FN 4] Defendant also separately argues, after the fact, that the
manner in which District Attorney Reed questioned him at trial
"revealed a deep personal bias against [defendant] that reinforced
the fact that the trial court should have disqualified both her and
Mulvihill prior to trial." We address this issue *post*.

Defendant filed T.G's handwritten notes about the informal
meeting as an exhibit in support of his motion to disqualify, T.G.'s
notes read:

"*I was advised not to speak with the public defender
"*I was told public defender may show up at my door calling
himself PD – I need to be careful
"*I was told the public defender will 'twist my words' in court
"*I was told I had no rights as [defendant's] wife to do anything
regarding this case
"*I was told that I had better hope that [defendant] takes the D.A.'s
first offer because they would just keep adding time if he did not
"*I stated that I do not want our boys [D.G. and C.G.] to be put on
the [witness] stand – Mr. Mulvihill told me that if they had to, they
would double [defendant's] time
"*I stated I did not want the [criminal protective order]"

Mulvihill also prepared a memorandum of his informal meeting
with T.G. and her father on February 10, 2004, which differed from
T.G.'s account. Mulvihill indicated that he "explained the criminal
procedure process (arraignment, preliminary hearing, arraignment
on the information, pre-trial conference, readiness conference and
trial)." He also "explained [their] offers and how they are arrived

at and how they go up usually after each appearance." After T.G. stated she wanted to help defendant, Mulvihill spoke at length emphasizing that it was the District Attorney's Office, and not her, that filed charges against defendant, but they wanted to hear whatever she had to say.

Mulvihill testified that he told T.G. that "she [had] the right to speak with and not speak with whoever [*sic*] she [wanted]," and that his office was "only interested in the truth." He told her that she could talk to the defense attorney or his investigator but did not have to talk with them. Mulvihill "informed her they have different interests and in [his] experience often twist the statements of witnesses to suit their needs." However, Mulvihill assured T.G. that he would not hold it against her if she chose to speak with the defense team.

When T.G. asked that the criminal protective order be lifted, Mulvihill explained his opposition. He also informed T.G. that she could attend at the next court appearance and explain her position to the judge.

Section 1424 governs motions to disqualify the prosecution, and states in pertinent part that, "[t]he motion may not be granted unless the evidence shows that a conflict of interest exists that would render it unlikely that the defendant would receive a fair trial." (§ 1424, subd. (a)(1).) The statute replaces the earlier rule announced in <u>People v. Superior Court (Greer)</u> (1977) 19 Cal.3d 255, 266, 267, 269, which authorized recusal based on the mere appearance of conflict. (<u>People v. Breaux</u> (1991) 1 Cal.4th 281, 294; <u>People v. Lopez</u> (1984) 155 Cal.App.3d 813, 824.) Section 1424 differs from the rule in <u>Greer</u> "in that it does not specify whether the disqualifying conflict must be 'actual' or 'apparent' but requires that it be 'of such gravity as to render it unlikely that defendant will receive a fair trial unless recusal is ordered.'" <u>Millsap v. Superior Court</u> (1999) 70 Cal.App.4th 196, 199 (<u>Millsap</u>), quoting <u>People v. Connor</u> (1983) 34 Cal.3d 141, 147 (<u>Connor</u>).) In other words, section 1424 "does not allow disqualification because participation of the prosecutor would be unseemly, appear improper, or even reduce public confidence in the criminal justice system. An actual likelihood of prejudice to defendant must be shown. [Citation.]" (<u>Millsap</u>, <u>supra</u>, at p. 200.) To prevail in a motion to disqualify the prosecution, defendant must satisfy a two-part test: (1) whether a conflict of interest exists; and (2) whether the conflict is "so grave as to render it unlikely that defendant will receive fair treatment. [Citation.]" (<u>People v. Eubanks</u> (1996) 14 Cal.4th 580, 594 (<u>Eubanks</u>).) The burden of persuasion is on the party seeking recusal. (See <u>People v. Hamilton</u> (1988) 46 Cal.3d 123, 140.)

"Our review involves both the substantial evidence test and examination for abuse of discretion. Factual issues are resolved

under the substantial evidence test; whether there is substantial evidence to support factual determinations reached by the trial court. [Citations.]  Once the pertinent factual issues are settled, the question whether the trial court's ruling should be upheld is determined under the deferential abuse of discretion test. [Citations.]"  (Millsap, supra, 70 Cal.App.4th at p. 200.)

B.  Analysis

Here, the trial court made no findings on questions of evidentiary fact – that is, whether there was a conflict of interest and whether defendant was unlikely to receive a fair trial.  (Eubanks, supra, 14 Cal.4th at p. 594.)  The accounts offered by T.G. and Mulvihill differed in the details of what was said in their informal meeting. We will not reweigh the court's implicit determination that defendant failed to sustain his burden of persuasion on the two-part test.  Mulvihill's description of the informal meeting with T.G. supports a conclusion that he was simply informing T.G. about the criminal process and did not demonstrate a conflict of interest or bias.  Accordingly, we conclude the court did not abuse its discretion in denying the motion to disqualify Mulvihill, Reed or the entire San Joaquin County District Attorney's office.

(Slip Op. at p. 15-20.)

At the outset, to the extent that Petitioner relies on state law and the California Constitution to support this Claim, it is not cognizable on federal habeas review.  See Estelle v. McGuire, 502 U.S. 62, 71-72 (1991).

"Due process guarantees that a criminal defendant will be treated with that fundamental fairness essential to the very concept of justice."  United States v. Valenzuela-Bernal, 458 U.S. 858, 872 (1982) (internal quotation marks and citation omitted).  Thus, "[i]n order to declare a denial of it we must find that the absence of that fairness fatally infected the trial; the acts complained of must be of such quality as necessarily prevents a fair trial."  Id. (internal quotation marks and citation omitted).

Prosecutors are "traditionally accorded wide discretion . . . in the enforcement process." Marshall v. Jerrico, Inc., 446 U.S. 238, 248 (1980).  Nonetheless, in Marshall, the Supreme Court stated that, "[a] scheme injecting personal interest, financial or otherwise, into the enforcement process may bring irrelevant or impermissible factors into the prosecutorial decision and in some

1  contexts raise serious constitutional questions." Id. at 249-50.  Additionally, the United States

2  Supreme Court has recognized that:

3          [a criminal prosecutor] is the representative not of an ordinary
           party to a controversy, but of a sovereignty whose obligation to
4          govern impartially is as compelling as its obligation to govern at
           all; and whose interest, therefore, in a criminal prosecution is not
5          that it shall win a case, but that justice shall be done.  As such, he
           is in a peculiar and very definite sense the servant of the law, the
6          twofold aim of which is that guilty shall not escape or innocence
           suffer.  He may prosecute with earnestness and vigor – indeed, he
7          should do so.  But, while he may strike hard blows, he is not at
           liberty to strike foul ones.  It is as much his duty to refrain from
8          improper methods calculated to produce a wrongful conviction as
           it is to use every legitimate means to bring about a just one.

9

10 Berger v. United States, 295 U.S. 78, 88 (1935).

11        Nonetheless, the standards of neutrality for prosecutors are not as demanding as those

12 applied to judicial or quasi-judicial officers.  See Young v. United States ex rel. Vuitton et Fils

13 S.A., 481 U.S. 787, 810 (1987).  Unlike judges who must always remain impartial, prosecutors

14 are partisan advocates who are permitted to be zealous in their enforcement of the law.  See

15 Marshall, 446 U.S. at 248-50.  Thus, a petitioner claiming that a prosecutor bore a personal bias

16 against him must demonstrate that the fairness of his trial was affected and that he was thus

17 prejudiced by the prosecutor's involvement.  See Dick v. Scroggy, 882 F.2d 192, 196-97 (6th

18 Cir. 1989) ("[W]e are not persuaded that Mr. Dick's prosecution by a Commonwealth Attorney

19 who may have been less than disinterested constituted an irregularity 'sufficiently fundamental'

20 to justify our setting aside the conviction in this case."); Gallo v. Kernan, 933 F. Supp. 878, 885

21 (N.D. Cal. 1996) (denying habeas relief where it was claimed that prosecutor demonstrated an

22 improper personal and emotional bias against petitioner by taking unprecedented actions,

23 including visiting the victim in the hospital, attending the victim's divorce proceedings and

24 taking positions adverse to petitioner, that the prosecutor had not taken in similar cases), aff'd,

25 141 F.3d 1175 (9th Cir. 1998).

26        In his amended federal habeas petition, Petitioner argues that the district attorneys had a

14

1  conflict of interest in this case due to their personal interest.  Petitioner failed to make a showing

2  that the district attorneys harbored such extreme personal bias or prejudice against Petitioner

3  such that his due process rights were violated.  The prosecutors proceeded against Petitioner after

4  statements implicating Petitioner in the charged crimes came not only from Petitioner's wife, but

5  also from Petitioner himself in his statements to the police.  Therefore, the prosecutors received

6  information from multiple sources regarding the circumstances that took place during January 31

7  - February 1, 2004 which gave rise to the charges against Petitioner.  As the United States

8  Supreme Court has noted, the prosecutor is allowed to be zealous in his enforcement of the law.

9  See Marshall, 446 U.S. at 248-50.  Petitioner failed to demonstrate that an alleged conflict of

10  interest on the part of the prosecutor prevented him from receiving a fair trial.  Accordingly, the

11  state appellate court's denial of this Claim was not an unreasonable application of clearly

12  established federal law nor did it result in a decision based on an unreasonable determination of

13  the facts.  Therefore, Petitioner is not entitled to federal habeas relief on Claim I.

14      B.  Claim II

15      In Claim II, Petitioner argues that the prosecutor committed misconduct during the trial

16  which violated his due process, fair trial and confrontation rights.  The last reasoned decision on

17  this Claim came from the California Court of Appeal on direct appeal which stated the following:

18      Defendant argues that he is entitled to reversal because Deputy
        District Attorney Reed committed misconduct when she asked
19      defendant during cross-examination whether he had cursed at her
        during trial.  There was no misconduct.

20
        "'The applicable federal and state standards regarding prosecutorial
21      misconduct are well established.  "'A prosecutor's . . . intemperate
        behavior violates the federal Constitution when it comprises a
22      pattern of conduct "so egregious that it infects the trial with such
        unfairness as to make the conviction a denial of due
23      process."'"  [Citations.]  Conduct by a prosecutor that does not
        render a criminal trial fundamentally unfair is prosecutorial
24      misconduct under state law only if it involves "'" the use of
        deceptive or reprehensible methods to attempt to persuade either
25      the court or the jury."'"  [Citation.]'  [Citation.]" (People v. Hill
        (1998) 17 Cal.4th 800, 819.)

26

Here the claim of misconduct involves Reed's cross-examination of defendant.  In general, the prosecution has broad latitude when cross-examining a defendant.  "'When a defendant voluntarily testifies, the district attorney may fully amplify his testimony by inquiring into the facts and circumstances surrounding his assertions, or by introducing evidence through cross-examination which explains or refutes his statements or the inferences which may necessarily be drawn from them.  [Citation.]  A defendant cannot, by testifying to a state of things contrary to and inconsistent with the evidence of the prosecution, thus indirectly denying the testimony against him, but without testifying expressly with relation to the same facts, limit the cross-examination to the precise facts concerning which he testifies.  [Citation.]'  [Citation.]"  (People v. Chatman (2006) 38 Cal.4th 344, 382.)  Although a prosecutor may not intentionally elicit inadmissible testimony, "merely eliciting evidence is not misconduct."  (Id. at pp. 379-380.)

Reed's questions to defendant were relevant and evinced an attempt to impeach defendant's testimony on cross-examination.  Moreover, nothing in Reed's questioning was "'"'"so egregious that it infect[ed] the trial with such unfairness as to make the conviction a denial of due process."'"'"  [Citations.]'"  (Hill, supra, 17 Cal.4th at p. 819.)  We recount the exchange in its entirety:

Q.  [by Reed]:  Now, when you spoke with the detectives, you told them that there was a lot of bad stuff that happened that day on February 1st of 2004?
A.  [Defendant]:  There was.
Q.  You – your testimony is that the only thing that was bad was you hitting your wife?
A.  No.  Cursing and screaming.  And saying mean things to her.  And hitting her.
Q.  All right.
A.  We don't allow that in our home, period.
Q.  So you don't curse?
A.  No.  We do not curse in our home.
Q.  Do you curse at all?
A.  Um, having been incarcerated for a year and a half with criminals, every third word I hear is a curse word.
MS. REED:  Objection.  Non-responsive.
THE COURT:  Sustained.
THE WITNESS:  It's pretty hard not to now.
THE COURT:  So your answer is yes, you do curse?
THE WITNESS:  What's the question?
MS. REED:  Q:  Whether you curse.
A.  Whether I curse now?
Q.  Yes.
A.  I have used vulgarity, yes, I have used curse words lately.  [¶]  But no, we don't use curse words at our home.
Q.  So since February 1st of 2004, you now curse?

16

1    A.  A little bit, yeah.  Too bad.  The environment that you stuck me
     in.
2    Q.  All right.  Haven't you cursed at me numerous time when we
     have been in court before?
3    A.  I don't recall.
     Q.  Said things like, 'Fuck you,' and, 'Bitch,' things like that?
4    [DEFENSE COUNSEL]:  I'm going to object.
     THE WITNESS:  I don't recall.
5    [DEFENSE COUNSEL]:  Relevance, Judge.
     THE COURT:  Overruled.
6    THE WITNESS:  Do you have – do you have some evidence?
     MS. REED:  Objection.
7    [DEFENSE COUNSEL]:  Is Ms. Reed making herself a witness
     now, judge?
8    THE WITNESS:  Wow.
     THE COURT:  Wait, wait, wait.  Stop.  You can answer the
9    question, Mr. Gill.  Have you said that?
     THE WITNESS:  What's the question?
10   [DEFENSE COUNSEL]:  I object.
     THE COURT:  Why don't you re[-]ask the question.
11   MS. REED:  Q.  Since February 1st of 2004, have you cursed?
     A.  I have already answered that question.
12   THE COURT:  The next question about you.
     MS. REED:  Q.  Have you cursed at me since February 1st?
13   A.  I have already answered that.
     THE COURT:  No, you didn't.
14   THE WINTESS:  Do you want to do a readback?
     THE COURT:  No, I don't.
15   MS. REED:  Q.  Have you cursed at me since February 1st of 2004?
     A.  I don't think so, no.  [¶]  And if you would have heard me
16   curse, it may have been in discussing something else.
     Q.  No, I'm talking about court proceedings when you've been in
17   custody in Department 25, and you have mouthed the words 'fuck
     you' repeatedly at me during those court proceedings, multiple
18   court proceedings, also the word 'bitch.'
     A.  Do you read lips now?
19   Q.  Sir, I'm asking you whether or not you did that, yes or no?
     A:  I may have said something.  Are you a lip reader now?
20   THE COURT:  Mr. Gill, if you could recall my admonition that the
     attorneys ask the questions –
21   THE WITNESS:  The words that I said –
     THE COURT:  – and the witnesses give the answers.
22   THE WITNESS:  I don't know whether I did nor didn't."

23   Based on this record there was no misconduct.

24   (Slip Op. at p. 32-36.)

25       A criminal defendant's due process rights are violated if prosecutorial misconduct renders

26   a trial "fundamentally unfair."  See Drayden v. White, 232 F.3d 704, 713 (9th Cir. 2000) (citing

                                             17

1   Darden v. Wainright, 477 U.S. 168, 183 (1986)).  A habeas petition will be granted for

2   prosecutorial misconduct only when the misconduct "so infected the trial with unfairness as to

3   make the resulting conviction a denial of due process." Darden, 477 U.S. at 181 (internal

4   quotation marks and citation omitted).  A claim of prosecutorial misconduct is analyzed under

5   the prejudice standard set forth in Brecht v. Abrahamson, 507 U.S. 619 (1993).  See Karis v.

6   Calderon, 283 F.3d 1117, 1128 (9th Cir. 2002) (stating that a claim of prosecutorial misconduct

7   is analyzed under the standard set forth in Brecht).  Specifically, the inquiry is whether the

8   prosecutorial misconduct had a substantial and injurious effect on the jury's verdict.  See

9   Johnson v. Sublett, 63 F.3d 926, 930 (9th Cir. 1995) (finding no prejudice from prosecutorial

10  misconduct because it could not have had a substantial impact on the verdict).

11         The California Court of Appeal did not unreasonable apply clearly established federal

12  law.  It articulated the relevant federal standard to determine whether the prosecutor's actions

13  amounted to misconduct by so infecting the trial with unfairness so as to make the conviction a

14  denial of Petitioner's due process rights and aptly applied this standard to this case.  Furthermore,

15  its decision was not based on an unreasonable application of the facts in the record.  It properly

16  outlined the colloquy that took place between Petitioner and Reed during cross-examination and

17  correctly found that the prosecutor's questions were simply an attempt to impeach Petitioner's

18  testimony.  Therefore, the state appellate court's decision did not run afoul of the standard

19  articulated in 28 U.S.C. § 2254(d).

20         Petitioner also failed to show that the prosecutor's questions had a substantial and

21  injurious effect on the jury's verdict, further warranting denying relief on this Claim.  It is worth

22  noting that the jury was specifically instructed that statements made by the attorneys during trial

23  are not evidence and that the jury "must decide all questions of fact in this case from the evidence

24  received at trial and not from any other source."  (See Reporter's Tr. at p. 1310.)  The jury is

25  presumed to have followed these instructions.  See Weeks v. Angelone, 528 U.S. 225, 234

26  (2000).  Thus, any purported misconduct would be considered harmless as well.

18

Petitioner also argues that the prosecutor's actions violated the Confrontation Clause because through her questioning she acted as a witness whom Petitioner was not given the opportunity to cross-examine.  The Confrontation Clause of the Sixth Amendment specifically provides that, "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him."  U.S. CONST., amend. VI.  The "witnesses" to which the Confrontation Clause refers include not only the witnesses testifying in court, but also certain out of court declarants.  See Crawford v. Washington, 541 U.S. 36, 50-51 (2004).  Statements by the prosecutor during trial were not evidence, as the jury was so instructed.  For that reason, the prosecutor's questions did not invoke the Confrontation Clause of the Sixth Amendment.[2]  Therefore, for the foregoing reasons, Petitioner is not entitled to federal habeas relief on Claim II.

C.  Claim III

In Claim III, Petitioner argues that the trial court violated his rights to due process and protection against self-incrimination when it admitted his statement to police which was allegedly extracted during an illegal police interrogation.  The last reasoned decision on this Claim was from the California Court of Appeal on direct appeal which stated the following:

> Defendant argues that the court violated his constitutional rights when it denied his motion to suppress the statements he made to police during the February 1, 2004, interview.  Defendant contends that the detectives ignored his multiple invocations of his Miranda rights [FN 5] and used overbearing tactics to extract an involuntary confession.  We conclude that the court properly determined that defendant voluntarily waived his Miranda rights.
> [FN 5]  Miranda v. Arizona (1966) 384 U.S. 436 [16 L.Ed.2d 694].
>
> A.  Invocation of Miranda Rights Must Be Unambiguous:
>
> "'[U]nder the familiar requirements of Miranda, designed to assure protection of the federal Constitution's Fifth Amendment privilege against self-incrimination under "inherently coercive"

---

[2] In his traverse, Petitioner argues that his Confrontation Clause argument requires *de novo* review because the state courts never reached the merits of this argument.  Even assuming *arguendo* that *de novo* review does apply to this argument, Petitioner still would not be entitled to federal habeas relief on his Confrontation Clause argument within Claim II for the reasons described above.

19

circumstances, a suspect may not be subjected to custodial interrogation unless he or she knowingly and intelligently has waived the right to remain silent, to the presence of an attorney, and to appointed counsel in the event the suspect is indigent.' [Citation.] 'Once having invoked these rights, the accused "is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police."' [Citations.] . . . [¶] If a suspect indicates 'in any manner and at any stage of the process,' prior to or during questioning, that he or she wishes to consult with an attorney, the defendant may not be interrogated. [Citations.]" (People v. Crittenden (1994) 9 Cal.4th 83, 129 (Crittenden), italics omitted.)

The defendant's request for counsel must be unambiguous. (Davis v. United States (1994) 512 U.S. 452, 459 [129 L.Ed.2d 362, 371] (Davis).) "'[A] statement either is such an assertion of the right to counsel or it is not.' [Citation.] Although a suspect need not 'speak with the discrimination of an Oxford don,' [citation], he must articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney." (Ibid.) Thus, in Davis, the United States Supreme Court rejected the defendant's claim that he invoked his right to counsel by saying, an hour and a half into the interview, "Maybe I should talk to a lawyer." (Id. at pp. 455, 462; see also Crittenden, supra, 9 Cal.4th at pp. 124, 130 ["Did you say I could have a lawyer?" was not an unequivocal request for counsel]; People v. Johnson (1993) 6 Cal.4th 1, 27, 30 ["[M]aybe I ought to talk to my lawyer, you might be bluffing, you might not have enough to charge murder" was not an unequivocal request for counsel].)

When reviewing defendant's challenge to the trial court's denial of his motion to suppress on the grounds the statements were obtained in violation of Miranda, "we defer to the trial court's resolution of disputed facts, including the credibility of witnesses, if that resolution is supported by substantial evidence. [Citation.] Considering those facts, as found, together with the undisputed facts, we independently determine whether the challenged statement" was unlawfully obtained. (People v. Gurule (2002) 28 Cal.4th 557, 601.)

Here, defendant asserts he invoked his right to remain silent 15 times. In general, these were instances where Rodriguez or Molthen asked defendant a specific question and defendant responded "I can't answer that," or "I really can't say anything about it," or "there's nothing I can say," or "I'm not going to answer that question," or "if you guys can't put it together . . . , I'm not going to put it together for you." In each instance, defendant continued to answer other questions about the events of February 1,

2004.  For this reason, the circumstances of this case differ from Michigan v. Mosley (1975) 423 U.S. 96, 103-04 [46 L.Ed.2d 313, 322] where defendant declined to answer any questions about the robberies at issue in the case.

Defendant acknowledges that his purported invocation of the right to remain silent "may have appeared equivocal at some points." Citing People v. Wash (1993) 6 Cal.4th 215, 238 (Wash), he maintains that a suspect's invocation of rights "does not have to be unequivocal."  But the court in Wash found that similar language – "'I don't know if I wanna talk anymore since it's someone killed, you know'" – was an expression of "uncertainty as to whether he wished to continue."  (Ibid.)  After considering the matter, defendant in Wash clearly stated he wished to continue with the interrogation.  (Id. at p. 239.)

Here, in February 2005 Judge Van Oss examined the written transcript of defendant's statement line by line and found that "[defendant] never made it clear that he wanted to invoke his rights, or at least not to the point it was clear to the officer anyway.  And he never – even where he might have made it clear, even where – I think I mentioned one of these earlier where it looked to me like he probably had invoked his rights, he reinitiated on his own the conversation.  It wasn't the police that did it."  The court observed that defendant "indicat[ed] a desire" through the interview to "clear this up," while at the same time realizing that "he probably [was] digging a hole for himself."  At another point during the interview, defendant stated something to the effect of "I know I'm throwing the Fifth Amendment out the door."  The court found that "[t]he clear inference of that [statement was] I am waiving my rights under the Fifth Amendment, and I know I'm guilty so I don't care about that."  On independent review, we reach the same conclusion as the trial court.  A reasonable police officer would not have understood the cited statements to be invocations of the right to remain silent.  (Davis), supra, 512 U.S. at p. 459 [129 L.Ed.2d at p. 371].)

B.  A Miranda Waiver and Confession Must be Voluntary:

A Miranda waiver must be knowing, intelligent *and* voluntary. (Colorado v. Spring (1987) 479 U.S. 564, 573 [93 L.Ed.2d 954, 965].)  There are two distinct dimensions to this requirement: "'[F]irst the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception.  Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it.  Only if the "totality of the circumstances surrounding the interrogation" reveals both an uncoerced choice and the requisite level of comprehension may a court properly conclude that Miranda rights have been waived.'"  (Ibid., quoting

<u>Moran v. Burbine</u> (1986) 475 U.S. 412, 421 [89 L.Ed.2d 410, 421].)

Where, as here, defendant challenges his statements as coerced, we view the totality of the circumstances surrounding the statements to determine independently whether the prosecution has met its burden and proved that the statements were voluntary.  (<u>Arizona v. Fulminate</u> (1991) 499 U.S. 279, 285-286 [113 L.Ed.2d 302, 315]; <u>People v. Thompson</u> (1990) 50 Cal.3d 134, 166, disapproved on other grounds in <u>Creutz v. Superior Court</u> (1996) 49 Cal.App.4th 822, 829.)  In making that determination, we consider factors such as the length of the interrogation, its location, its continuity, and the defendant's sophistication, education, physical condition and emotional state.  (<u>People v. Williams</u> (1997) 16 Cal.4th 635, 660 (<u>Williams</u>); <u>In re Shawn D.</u> (1993) 20 Cal.App.4th 200, 209.)  "[A]ny factual findings by the trial court as to the circumstances surrounding an admission or confession, including "'the characteristics of the accused and the details of the interrogation" [citation],' are subject to review under the deferential substantial evidence standard.  [Citation.]" (<u>Williams</u>, <u>supra</u>, 16 Cal.4th at p. 660.)

In this case, two different judges reviewed defendant's interview with law enforcement and both found his statement admissible.  After reviewing the written transcript, Judge Van Oss rejected defendant's claim of coercion.  He found that "taking the statement in context, there's nothing to indicate that the defendant somehow didn't understand what he was doing.  Certainly wasn't in his best interest, and he knew it wasn't in his best interest, but he went ahead and did it anyway because it was his choice.  And he had the right to make that choice . . . ."

Later, at the start of trial in June 2005, Judge Fox entertained a motion for reconsideration to the extent it involved the review of the videotape of defendant's interrogation.  She "was not looking at the content of the statement, because Judge Van Oss ruled on that.  But [she] was looking at the tone and tenor, demeanor, and body language, to see if there was anything there that would cause [her] to grant other reconsideration."  She cited the length of the interrogation, its location, the continuity, and defendant's physical condition and "did not see any indication that the officers were intimidating the defendant, no indication that he was intimidated.  He participated in the interview, at times asking questions on his own."  Judge Fox also found nothing in defendant's age, education or level of intelligence that raised any claim of coercion.  Based on these findings, which are supported by the evidence, we conclude defendant's statements were voluntary.

(Slip Op. at p. 21-27.)

As in his state filings, Petitioner raises two issues within this Claim; first he argues that

22

1  the police ignored his right to remain silent on several occasions during the interrogation, and

2  second, that the police exploited Petitioner's unstable psychological state, hunger, fatigue and

3  concern for his children in extracting an involuntary waiver of his <u>Miranda</u> rights.  Both of these

4  issues are considered in turn.

5                   i.  Invocation of Right to Remain Silent

6        After being read his <u>Miranda</u> rights at the beginning of the interrogation, Petitioner

7  responded that he understood them and began to answer the questions posed to him by the police.

8  (<u>See</u> Clerk's Tr. at p. 844.)  Petitioner lists multiple instances in his interrogation where he

9  asserts that he invoked his right to remain silent and therefore the interrogation should have

10  ceased.  Those instances were the following:

11               RODRIGUEZ:  Ok.  At some point in the evening you go back to
your house.  Can, can you tell us about that?

12               GILL:  Um . . . . the . . . I left a really wide trail.  Um, it's huge.
And if you guys can't put it together, you know, I'm not going to

13               put it together for you .

14  (Clerk's Tr. at p. 849.)

15               RODRIGUEZ:  Well . . . let me ask you this.  How did you end up
with [your wife]?  How did [your wife] end up in your car?

16               GILL:  Didn't . . . . I really can't say anything about it.
RODRIGUEZ:  Cause you don't want or . . . ?

17               GILL:  I don't recall most of it.  It's kind of a blur.  I feel like I was
. . . I, I don't know.  Um . . .

18               RODRIGUEZ:  We're, we're just trying to figure out what
happened.

19               GILL:  I did not plan . . . I'm not going to put a nail in my own
coffin and say, you know, what ever . . . so I have the right not to

20               say anything.
RODRIGUEZ:  That's true.  That's why I advised you of your

21               rights.
GILL:  Right.  You, you came in here and said . . . you . . . and you

22               said that the kids over heard something.  I'm asking you questions
about that.  You don't want to provide an explanation, that's your

23               choice.  It's going to be in the court record I guess.
RODRIGUEZ:  Yeah.  That's true.

24               MOLTHEN:  Like my partner was saying, Andrew, it's going to be
your kids up on the stand, providing the information.  It's going to

25               be [D.G.] and [C.G.] and it's going to be [your wife].  OK?  And
they're going to provide what, what they say, what they heard,

26               what they went through.

1    GILL:  OK.
     MOLTHEN:  And there's going to be no side to your story.
2    GILL:  What can I say.
     MOLTHEN:  Just because . . . we don't want this report just to
3    have everything and then come, come down to . . .to your side of
     the story and you say, I was on auto pilot.
4    GILL: There's nothing I can say.
     MOLTHEN:  Did you feel what happened last night?
5    GILL:  Huge.

6    (Id. at p. 851-52.)

7    MOLTHEN:  I mean in . . . in the scheme of your life, is this the
     worse [sic] thing you have ever done?
8    GILL:  I can't answer that.
     MOLTHEN:  Can't answer that?  Is it because you don't want to or
9    you don't think it is?
     GILL:  Cause I don't want to.

10

11   (Id. at p. 333.)[3]

12   RODRIGUEZ:  Did it at any point, last night, did you force [your
     wife] to do anything?
13   GILL:  I'm not going to answer that question.

14   (Id. at p. 852.)

15   RODRIGUEZ:  See, that's that's the kind of stuff that we don't
     know.  Cause all we've had so far is to hear her side of it.
16   GILL:  That's all.  It's . . . that's all I need to say about it.  I'm . . .
     I'm freaked out about it and I, I really fell bad that she is not doing
17   well right now.
     RODRIGUEZ:  You feel bad for her or for yourself?
18   GILL:  No, for her.
     RODRIGUEZ:  OK.
19   GILL:  Me, I don't, I don't give a rat's ass.

20   (Id.)

21   RODRIGUEZ:  See that . . . that's . . . I, I've never met you and
     I'm not trying to judge you and I'm not going to judge you.  That's
22   . . . that's not my job.  Um, but, you know, uh, I'm here just trying
     to do a job and . . .
23   GILL:  Anything I say can and will be used against me in a court of
     law.

24

_____

25       [3] This section of Petitioner's statement to police is redacted on the version of the
26   transcript supplied by the Respondent.  Therefore, this colloquy is taken from Petitioner's motion
     to suppress the statement that Petitioner filed in the trial court.

1         RODRIGUEZ:  Exactly.

GILL:  OK.  I'm sorry.  It is, it is very wide and obvious.  You take

2         that.

MOLTHEN:  It's very obvious?

3         GILL:  I left it.  OK.  I could have un-did it.  I could have put it all

back together.

4

5   (Id. at p. 853.)

6         MOLTHEN:  You, you know what she told us?  She said it was

like being with two different . . . people.  Pardon my voice, I have a

7         cold.  She said it was like being with two different people.  Her . . .

her . . . her . . . her trip with you last night.  She said it was like, at

8         first she said it was being with a savage and then . . . and then all of

a sudden you slowly changed into the man . . . she married . . . fell

9         in love with, married and has kids with.  It was . . .

GILL:  I can't answer the question.

10

11   (Id. at p. 854.)

12         RODRIGUEZ:  What, what happened last night, is not that you

don't remember, you just don't want to talk about that?  Is that fair

13         to say?

GILL:  No.  I . . . I remember pictures of justice and . . . I don't

14         know why . . . I don't know.

RODRIGUEZ:  You remember going into the house?

15         GILL:  I can't answer that question.

RODRIGUEZ:  Do you remember driving with her?

16         GILL:  Oh yeah.

17   (Id. at p. 855.)

18         MOLTHEN:  I've, I've driven through Jackson maybe once or

twice in my life so . . . I, I don't really know.

19         GILL:  And uh . . . you know, you guys got the story and anything I

add to it is just going to screw me even more.  Um . . .

20         RODRIGUEZ:  Well, what do you think should happen to you?

What do you think we should do with you?

21         GILL:  I don't know.  I need some help.  I hurt inside, and my head

hurts.

22

23   (Id. at p. 860.)

24         MOLTHEN:  There was a coffee table underneath the window that

your two kids discovered.  Where there were items on there . . . a

25         picture frame, I think, a lamp that were knocked over on to the

ground.  You know what happened there?

26         GILL:  I don't know.  It, it . . . you could drive a truck through it

1         my friends, you figure it out.

2 (Id. at p. 861.)

3         RODRIGUEZ:  Unless you tell us something that corroborate [sic]
what she said without us having to, to spoon feed it to you, you
4         know, that's going to be up in the air.  And like you said she's a
good person.
5         GILL:  What is the first line of the Miranda?  To . . . I'm not so
freakin' dumb.
6         RODRIGUEZ:  You basically don't want to say anything that's
going to implicate you?  Is that right?
7         GILL:  I'm not . . . slam the door on myself.  I, I don't understand.
MOLTHEN:  Are you hoping to get away with what you did?
8         GILL:  No way.
MOLTHEN:  No?
9         GILL:  No.
MOLTHEN:  Tell us what you did.  It's as, it's as simple as that.
10        We know that you did it.  Cause we talked to your wife and we
talked to your children ok.  You said you would corroborate what
11        they said.
GILL:  OK.  I will sit down and corroborate . . .
12

13 (Id. at p. 862.)

14         RODRIGUEZ:  Did you have sex with her?
GILL:  Yeah.
15         RODRIGUEZ:  Was that with consent?
GILL:  I can't answer that.  I don't know.  I think so.
16

17 (Id. at p. 867.)

18        Petitioner does not argue that he initially waived his right to remain silent.  However, the

19 police must cease questioning when the person clearly indicates he wants to stop

20 answering.  Miranda, 384 U.S. at 473-74.  In Davis v. United States, 512 U.S. 452, 459 (1994),

21 the Supreme Court stated that a suspect must unambiguously request counsel for the

22 interrogation to cease.  This rule has also been applied to require a suspect to unambiguously

23 invoke his right to remain silent before police must cease questioning.  See DeWeaver v.

24 Runnels, 556 F.3d 995, 1001 (9th Cir. 2009).  "[A]t a minimum, such invocation must not be so

25 equivocal or unclear that a reasonable officer in light of the circumstances would have

26 understood only that the suspect *might* be invoking his right to remain silent."  United States v.

26

1  Shi, 525 F.3d 709, 729 (9th Cir. 2008) (internal quotation marks and citations omitted) (emphasis

2  in original).

3          As noted above, the California Court of Appeal determined that a reasonable police

4  officer in the light of the circumstances would not have understood Petitioner's statements listed

5  above as invoking his right to remain silent.  This conclusion was not an unreasonable

6  application of clearly established federal law nor did it result in a decision that was based on an

7  unreasonable determination of the facts in the record.  Petitioner's words as detailed above do not

8  imply a request to terminate the interview and invoke Petitioner's right to remain silent.  Thus,

9  Petitioner's first argument within Claim III does not merit federal habeas relief.

10              ii.  Exploitation of Petitioner's unstable psychological state, hunger, fatigue and
                    concern for his children

11

12         Next, Petitioner lists several factors that were in play which made his waiver of his

13  Miranda rights not voluntary.  Petitioner notes that he had been awake for over thirty-four hours

14  when the interrogation took place and that he had had nothing to eat and only coffee to drink for

15  twenty-four hours leading up to the interrogation.  He also notes that the police threatened to put

16  his wife and children on the stand if he did not recount his version of events.  Finally, Petitioner

17  argues that the police delayed Petitioner from receiving medical attention.  Based on all of these

18  factors, Petitioner argues he could not have given a voluntary waiver of his Miranda rights.

19         An interrogation statement must be suppressed when the totality of the circumstances

20  demonstrates that the confession was involuntary.  See DeWeaver, 556 F.3d at 1002-03 (citing

21  Dickerson v. United States, 530 U.S. 428, 434 (2000)).  The assessment of the totality of the

22  circumstances may include consideration of the length and location of the interrogation;

23  evaluation of the maturity, education, physical and mental condition of the defendant; and a

24  determination of whether the defendant was properly advised of his Miranda rights.  See

25  Withrow v. Williams, 507 U.S. 680, 693-94 (1993).  The police cannot extract a confession "by

26  any sort of threats or violence, (or) . . . by any direct or implied promises, however slight, (or) by

27

1    the exertion of any improper influence." <u>Hutto v. Ross</u>, 429 U.S. 28, 30 (1976) (per curiam).  "A

2    confession accompanied by physical violence is *per se* involuntary, while one accompanied by

3    psychological coercion is not."  See <u>United States v. Haswood</u>, 350 F.3d 1024, 1027 (9th Cir.

4    2003).

5            The interrogation does not suggest that Petitioner's waiver of his <u>Miranda</u> rights was

6    anything but knowing, voluntary and intelligent.  Petitioner was read his <u>Miranda</u> rights at the

7    start of the interrogation and he told the police that he understood them.  For example, at one

8    point during the interview, Petitioner repeated that anything he said could be used against him in

9    a court of law.  (See Clerk's Tr. at p. 853.)  Thus, Petitioner was clearly aware of the rights that

10   he was waiving in speaking to the police during the interrogation.  The interrogation transcript

11   indicates Petitioner's awareness of his rights and willingness to speak to the police and his

12   purported fatigue and hunger did not make his waiver involuntary.  <u>Cf.</u> <u>Shackleford v. Hubbard</u>,

13   234 F.3d 1072, 1080 (9th Cir. 2000) (counsel not ineffective for failing to challenge a waiver of

14   <u>Miranda</u> rights as involuntary based on defendant's drug use, fatigue and mental deficiencies

15   where evidence demonstrated defendant's awareness of rights and willingness to speak with

16   police).  Thus, Petitioner is not entitled to federal habeas relief on this argument as well, and

17   Claim III should be denied.

18           D.  Claim IV

19           In Claim IV, Petitioner argues that the preliminary examination was held in violation of

20   California Penal Code § 859b because it was not held within ten days of the arraignment thereby

21   violating his Constitutional rights.  The last reasoned decision on this Claim was from the

22   Superior Court of California, San Joaquin County on Petitioner's state habeas petition which

23   stated the following:

24              Petitioner contends that the Trial Court lacked subject matter
                jurisdiction to try Petitioner because his Preliminary Examination
                hearing was held in violation of Penal Code § 859(b) [sic], after the
25              10-day time limit, and that he did not waive time.  The file
                indicates that Petitioner was arraigned on Thursday, February 5,
26

28

2004, and his initial Preliminary Examination was set for Thursday, February 19, 2004.

California Penal Code § 859b provides, in part: "Both the defendant and the people have the right to a preliminary examination at the earliest possible time, *and unless both waive that right* or good cause for a continuance is found as provided for in Section 1050, the preliminary examination shall be held *within 10 court days* of the date the defendant is arraigned or pleads, whichever occurs later, . . . The magistrate shall dismiss the complaint if the preliminary examination is set or continued more than 60 days from the date of the arraignment, plea, or reinstatement of criminal proceedings pursuant to Chapter 6 (commencing with Section 1367) of Title 10 of Part 2, *unless the defendant personally waives his or her right to a preliminary examination within the 60 days*." (Emphasis added.) A review of a 2004 calendar indicates that Monday, February 16, 2004, was a holiday and the Court was closed. Counting the actual "court days" from February 5, 2004 to February 19, 2004, reflects that the Petitioner's Preliminary Examination hearing was set nine (9) court days after he was initially arraigned, sufficiently within the statutory time requirements.

The Court's Minute Order from the February 19, 2004, Preliminary Examination hearing indicates that both "Defendant" and the "People" waived time to continue the hearing to March 18, 2004. Petitioner has failed to set forth any facts supporting the allegations in the Petition with particularity. Vague or conclusory allegations do not warrant habeas relief. [People v. Duvall (1995) 9 Cal.4th 464, 474, 37 Cal.Rptr2d 259.] Conclusory allegations are insufficient to constitute a prima facie showing for habeas corpus relief. [In re Bower (1985) 38 Cal.3d 865; 215 Cal. Rptr. 267, 700 P.2d 1269; People v. Jackson (1980) 28 Cal.3d 264; 168 Cal.Rptr. 603, 618 P.2d 149.] If no prima facie claim for relief is stated, or if the claims asserted in the petition are procedurally barred, the court will summarily deny the petition. [People v. Duvall (1995) 9 Cal.4th 464, 475, 37 Cal.Rptr.2d 259.]

The Petition is DENIED.

(Resp't's Lodged Doc. 8 at p. 1-2.)

The Ninth Circuit has noted that the preliminary hearing itself is not constitutionally mandated. See Peterson v. California, 604 F.3d 1166, 1169 (9th Cir. 2010); see also Ramirez v. Arizona, 437 F.2d 119, 119-20 (9th Cir. 1971) (per curiam) ("The Federal Constitution does not secure to a state court defendant a right to a preliminary hearing."). Thus, Petitioner's claim appears to only raise an issue of state law that is not cognizable under federal habeas review as

the preliminary hearing itself is not constitutionally mandated.  Furthermore, Petitioner waived

time at the February 19, 2004 hearing, or within the ten day state designated limit, to March 18,

2004 at which time the preliminary examination occurred.[4]  (See Clerk's Tr. at p. 34.)  Thus, for

the foregoing reasons, Claim IV should be denied.

## VI.  PETITIONER'S REQUESTS

### A.  Request for Discovery

Petitioner requests his jail records and the videotape of Petitioner in the interrogation

room before and during the interrogation.  (See Pet'r's Am. Pet. at p. 73.)  Parties to a habeas

proceeding are not entitled to discovery as a matter of course.  See Bracy v. Gramley, 520 U.S.

899, 904 (1997).  Rather, "[a] judge may, for good cause, authorize a party to conduct discovery

under the Federal Rules of Civil Procedure and may limit the extent of discovery."  Rule 6(a),

Rules Governing § 2254 cases; see also Bracy, 520 U.S. at 904.  Good cause is shown "where

specific allegations before the court show reason to believe that the petitioner may, if the facts

are fully developed, be able to demonstrate that he is . . . entitled to relief."  Id. at 908-09.  In this

case, Petitioner fails to show good cause to warrant his request for discovery such that the request

will be denied.

### B.  Request for an Evidentiary Hearing

Petitioner also requests an evidentiary hearing.  A court presented with a request for an

evidentiary hearing must first determine whether a factual basis exists in the record to support

petitioner's claims, and if not, whether an evidentiary hearing "might be appropriate."  Baja v.

Ducharme, 187 F.3d 1075, 1078 (9th Cir. 1999); see also Earp v. Ornoski, 431 F.3d 1158, 1166

---

[4] Petitioner argues in his Petition that he did not waive time and that the February 19, 2004 minute order is ambiguous.  The February 19, 2004 minute order is not ambiguous.  Petitioner relies on the fact that both the "time not waived" and "time waived" boxes are checked off.  However, the "time not waived" check mark is then crossed out.  Further illustrating that there is no ambiguity is the fact that the minute order does not check off which party did not waive time, but checks off both the Defendant and the People as specifically waiving time.  (See Clerk's Tr. at p. 34.)  Petitioner's after the fact declaration that he did not waive time does not cast doubt on his waiver as indicated on the minute order.

(9th Cir. 2005).  A petitioner requesting an evidentiary hearing must also demonstrate that he has presented a "colorable claim for relief." <u>Earp</u>, 431 F.3d at 1167 (citations omitted).  To show that a claim is "colorable," a petitioner is "required to allege specific facts which, if true, would entitle him to relief." <u>Ortiz v. Stewart</u>, 149 F.3d 923, 934 (9th Cir. 1998) (internal quotation marks and citation omitted).  In this case, an evidentiary hearing is not warranted for the reasons in <u>supra</u> Part V which analyzed the Claims and determined that they should and can be denied on the current record.  Thus, his request will be denied.

## VII.  CONCLUSION

Accordingly, IT IS HEREBY ORDERED that:

1.      Petitioner's request for discovery is DENIED; and

2.      Petitioner's request for an evidentiary hearing is DENIED.

For all of the foregoing reasons, IT IS RECOMMENDED that the amended petition for writ of habeas corpus be DENIED.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty-one days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections shall be served and filed within seven days after service of the objections.  The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order.  <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).  In any objections he elects to file, Petitioner may address whether a certificate of appealability should issue in the event he elects to file an appeal from the judgment in this case.  <u>See</u> Rule 11, Federal Rules Governing Section 2254 Cases (the district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant).

//

DATED:  May 24, 2011

TIMOTHY J BOMMER
UNITED STATES MAGISTRATE JUDGE